OPINION
In September of 1994, appellant, North Coast Wood Products Inc. ("North Coast") entered a lease agreement as a tenant with appellee, Mentor Industrial Complex Limited ("Mentor"), to lease 4.48% of an industrial complex in Mentor, Ohio. The lease provided in paragraph 41:
 "Tenant [North Coast] shall pay, as additional rent, its Pro Rata Share of all operating costs. Operating costs shall be those costs incurred by Landlord [Mentor] which benefit the property as a whole and shall include, without limitation, costs to provide security and guard service; landscaping; snow removal from roads, parking lots and driveways; fees connected with the facility's fire alarm system; insurance premiums; common utilities; structural and nonstructural repairs, normal replacements and maintenance of improvements benefiting the facility as a whole (e.g., common road, fences, outside lights); rail switch maintenance; and management fees and costs. Upon request by Tenant, Landlord shall furnish Tenant with copies of bills or other proof of such expenses. This shall not include costs or expenses associated with any subdivision or sale of any portion of the land or buildings surrounding the demised premises." (Emphasis added)
 The parties call these fees the "common area maintenance" ("CAM") fees.
Since the inception of the lease, appellee computed the management fees, listed as an element of the CAM fees, as 5% of all tenant rents collected at the industrial complex from all tenants. Appellant was billed for its pro rata share of the management fees. Appellant's share of the management fees amounted to $72,623 in 1996 and 1997. Appellant paid these amounts without question. In 1998, the line item for management fees increased to $179,497.64. Appellant also paid these fees without question.
On July 13, 1999, appellee filed a complaint against appellant for breach of contract and declaratory judgment claiming that appellant owed it $95,693.49. Appellant answered and counterclaimed, alleging, interalia, that appellant had overpaid appellee for CAM charges that were not permitted under the lease.
Prior to the commencement of trial proceedings, the parties entered into written stipulations. The stipulations left, as the sole issue before the trial court, the issue of "whether Plaintiff is entitled to the line item designed [sic] management fee under the terms of the lease and, if so, what is the proper method of calculating the management fee." (Findings of Fact and Conclusions of Law, at 1).
At the one-day bench trial, appellant's president and corporate representative, Harry Fishleigh ("Fishleigh"), testified that he had negotiated the lease with appellee, and that he consulted with counsel in the course of the negotiations. Fishleigh also testified that he read and understood the contract before signing it, but that he was unaware that the management fee would be 5% of all rent collected from the rental complex.
Appellee presented an expert witness, who testified that the method of calculating management fees used by appellee was standard in the field of commercial leases, and that the figure of 5% was reasonable for the location in which the industrial complex is located.
The trial court, in a Judgment Entry dated April 21, 2000, held that appellee was "entitled to collect management fees from [appellant], calculated as `5% of all tenant rents collected at the industrial complex from all tenants'" and held appellant liable for all management fees under the lease. Upon appellant's motion, the court issued findings of fact and conclusions of law on June 19, 2000. Appellant filed a timely appeal raising the following assignment of error:
 "[1.] The trial court erred in finding that the plain and ordinary meaning of the term `management fee' is 5% of all rent collected from the property, Mentor Industrial Complex."
 The interpretation of a written contract is a matter of law for the court. Latina v. Woodpath Dev. Co. (1990), 57 Ohio St.3d 212, 214, 567 N.E.2d 262. The court is to interpret the contract to carry out the intent of the parties. Skivolocki v. East Ohio Gas Co. (1974), 38 Ohio St.2d 244, 313 N.E.2d 374, paragraph one of the syllabus. The intent of the parties is presumed to reside in the language employed in the agreement. Kelly v. Medical Life Ins. Co. (1987), 31 Ohio St.3d 130, 509 N.E.2d 411, paragraph one of the syllabus. "Only when the language of a contract is unclear or ambiguous, or when the circumstances surrounding the agreement invest the language of the contract with a special meaning will extrinsic evidence be considered in an effort to give effect to the parties' intentions." Shifrin v. Forest City Ent., Inc. (1992), 64 Ohio St.3d 635, 638, 597 N.E.2d 499, syllabus. Where there is no ambiguity in the terms employed in the contract, courts are not to create a new contract by finding intent not expressed therein. Id. at 638.
When looking strictly at the terms of the contract, what is meant by the term "management fees" is unclear. Because this term is unclear, the court may use extrinsic evidence to interpret the term. Shifrin, supra. Extrinsic evidence of a general custom or trade usage is admissible to show that the parties to the contract employed terms which have a special meaning within a particular trade or industry which are not reflected on the face of the agreement. Alexander v. Buckeye Pipe Line Co. (1978),53 Ohio St.2d 241, 374 N.E.2d 146, paragraph three of the syllabus.
Carol O'Hara ("O'Hara"), an employee of Quadrell Realty Services ("Quadrell"), the company that manages the industrial park, testified at the trial. She testified that appellant's lease contract contains a provision that requires appellant to pay management fees, as do the other 200 leases with which she works. O'Hara also testified that these management fees are calculated at 5% of the total income of the property.
John Misterka ("Misterka"), vice president of a worldwide commercial real estate company, testified as an expert witness in the field of commercial real estate. He testified that management fees are typically a percentage of rents collected. He also testified that 5% is a normal and customary charge for management fees, and that it is a fair and reasonable charge for Lake County, Ohio.
The trial court, as the trier of facts, determines the credibility of witnesses. Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77, 80. "Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." C.E. Morrisv. Foley Construction Co. (1978), 54 Ohio St.2d 279, syllabus. The testimony of O'Hara and Misterka is sufficient competent, credible evidence to support the conclusion that the proper interpretation of management fees is 5% of all rents collected from the property.
In addition, it is a longstanding principle of contract law that when contract language is unclear, a court may look to the course of conduct between the parties as evidence of the construction which they gave to the agreement. See Blosser v. Carter (1990), 67 Ohio App.3d 215, 219,586 N.E.2d 253; citing Mosier v. Perry (1899), 60 Ohio St. 388,54 N.E. 364, paragraph one of the syllabus. In the case sub judice, appellant was billed for the CAM regularly, and appellant paid each bill without question.
Appellant, during the contract negotiations, was informed about the CAM provision, had its attorney examine the lease, and received advice from counsel on the terms of the lease. Appellant also had the right, under the lease contract, to obtain an accounting of all charges included as CAM fees, including the management fee. Appellant did not question the charge at any time, but instead paid each bill without question, until after appellee filed suit against North Coast. There is competent, credible evidence to support a finding that appellant is required to pay maintenance fees calculated as 5% of all rents collected from the property.
Thus, appellant's assignment of error is without merit.
Based on the foregoing analysis, we affirm the decision of the Lake County Court of Common Pleas.
 ____________________________ JUDGE ROBERT A. NADER
O'NEILL, P.J., concurs, GRENDELL, J., dissents.